# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DTN, LLC F/K/A/ TELVENT DTN, LLC, | : : : | |
| Plaintiff, | : : | |
| v. | : : | C.A. No. 18-384-LPS |
| PIONEER HI-BRED INTERNATIONAL, INC., | : : : : | |
| Defendant. | : | |

## **MEMORANDUM ORDER**

Pending before the Court is Plaintiff DTN, LLC's ("DTN") motion for a temporary restraining order ("TRO") and preliminary injunction. (D.I. 2) Having reviewed the parties' submissions (*see* D.I. 2, 3, 4, 15, 16, 19)[1] and having heard argument on the motion during a teleconference earlier today, **IT IS HEREBY ORDERED** that DTN's motion (D.I. 2) is **DENIED**, for the reasons stated below.

    1.    A preliminary injunction is an "extraordinary remedy" that should be granted only if: "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *NutraSweet Co. v. Vit–Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) ("*NutraSweet II*"). The elements also apply to temporary restraining orders. *See NutraSweet Co. v. Vit–Mar Enters., Inc.*, 112 F.3d 689, 693

---

[1]The Court has also considered the record and arguments made in a related case (C.A. No. 18-206) between these same parties, as well as the Court's decision in that matter to deny a motion for a TRO and preliminary injunction sought by Pioneer Hi-Bred International, Inc.

1

(3d Cir. 1997) ("*NutraSweet I*"). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet II*, 176 F.3d at 153.

2.  DTN asserts that Defendant Pioneer Hi-Bred International, Inc. ("Pioneer") breached § 7.5(g) of the parties' Agreement and tortiously interfered with DTN's subscription agreements with the parties' joint customers by inducing those customers to cancel their subscription agreements with DTN. Section 7.5(g), which became effective after the parties purported to cancel their Agreement, requires the parties to "cooperate and exchange information to ensure that all customer subscription agreements for Collaboration Products are honored for the duration of the term of such agreements." (D.I. 4 Ex. A)

3.  DTN predicates its motion largely on two emails from agents for Pioneer, which were sent following DTN's decision to begin direct billing customers of Collaboration Products ("Collaboration Customers") under the subscription agreements rather than accepting payment directly from Pioneer on behalf of those customers, as DTN was doing before. First, one of Pioneer's agents sent an email on January 26, 2018 intended for "anyone who has DTN online & a weather station," informing such customers that if they receive an invoice from DTN "billing [them] directly (instead of billing Pioneer previously)" such customers "**are under no obligation to continue with any services through DTN**." (D.I. 4 Ex. D) (emphasis in original)[2] This email message continued:

> If you receive an invoice or statement, please do not feel like you
> are obligated to pay that or commit to renew unless you do wish to
> keep the subscription or had your own subscription prior to
> Encirca and wish to continue it. If you do not wish to keep the

---

[2]In fact, the subscription agreements place limits on when customers may cancel. (*See* D.I. 4 Ex. B)

2

> subscription, **feel free to let them know that you would like to cancel**, or pass any correspondence/invoices along to me and I will handle it.

(*Id.*) (emphasis added)  Second, on March 5, 2018, another Pioneer agent received an email with the subject line, "Fwd: Cancelling DTN," which begins with the headline: "**Make Canceling DTN Subscriptions a Priority**."  (D.I. 4 Ex. C) (emphasis in original)  Pioneer explained during the teleconference today that its investigation has revealed that a Pioneer employee wrote the text of this email – which goes on to provide step-by-step directions on how to dismantle a DTN weather station and "cancel the DTN subscription" – which was then forwarded to at least one of Pioneer's independent sales representatives.

4. DTN is likely to prove that Pioneer breached its contractual obligations under § 7.5(g), and tortiously interfered with DTN's subscription agreements with the Collaboration Customers, as the quoted text from the two email messages is in direct conflict with Pioneer's obligations to "**cooperate** and exchange information **to ensure** that **all customer subscription agreements** [e.g., of whatever length] **for Collaboration Products** are honored for the duration of the term of such agreements."  (D.I. 4 Ex. A) (emphasis added)

5. However, DTN has failed to meet its burden to show that it will suffer irreparable injury if the requested relief is not granted.  While Pioneer did concede during the teleconference that the two emails are not consistent with Pioneer's obligations under § 7.5(g), Pioneer also represented that after learning of the emails it has instructed Pioneer employees and agents **not** to encourage Collaboration Customers to cancel their subscriptions with DTN.  Pioneer has further represented that it will not take any steps to encourage such customers to cancel such

3

subscriptions.[3] These representations – in combination with the lack of evidence (as opposed to speculation, however plausible) that any single customer has cancelled its DTN subscription due to Pioneer's conduct, rather than due to confusion and/or frustration as DTN and Pioneer have terminated their collaboration and DTN has begun directly billing customers for a service those customers previously received for "free," since Pioneer was paying DTN for it – leads the Court to conclude that DTN has failed to show it will suffer irreparable harm caused by Pioneer[4] in the absence of immediate relief.

6. DTN has met its burden to show that the balance of equities favors DTN. Any harm that would come to Pioneer as a result of the relief sought by DTN would be outweighed by the harm to DTN and its brand in the absence of relief (had DTN met its burden on irreparable harm), as DTN would be losing customers at the start of a growing season and may not be able to win them back until the end of the season or possibly for several years.

7. DTN has also met its burden to show that the public interest – in enforcing lawful contractual obligations and in reducing some of the confusion in the marketplace that currently exists due to the parties' conduct – favors the requested relief.

8. In the end, however, because DTN has not met its burden to show that all four factors support a TRO or preliminary injunction, the Court denies DTN's motion.

---

[3] Both parties are free to compete for the business of the Collaboration Customers (regardless of whether individuals were "DTN customers" or "Pioneer customers" prior to the collaboration) for the period after those customers' subscription agreements with DTN end, provided that the parties also comply with their obligations under § 7.5(g).

[4] It is undisputed that DTN has lost customers and money since the collaboration with Pioneer was terminated. What DTN has failed to show, on the current record, is that these losses (or even some of them) are attributable to Pioneer.

9. IT IS FURTHER ORDERED that the parties shall meet and confer and, no later than March 30, 2018, submit a joint status report advising the Court of their proposal(s) for how this case should now proceed.

March 19, 2018
Wilmington, Delaware

HON. LEONARD P. STARK
UNITED STATES DISTRICT JUDGE